[No. B167071. Second Dist., Div. Three. Dec. 29, 2004.]

NASHA L.L.C., Plaintiff and Appellant, v.
CITY OF LOS ANGELES et al., Defendants and Respondents.

472

COUNSEL

Luna & Glushon and Robert L. Glushon for Plaintiff and Appellant.

Rockard J. Delgadillo, City Attorney, Jeri L. Burge, Assistant City Attorney, and Steven N. Blau, Deputy City Attorney, for Defendants and Respondents.

OPINION

**KLEIN, P. J.**—Plaintiff and appellant Nasha L.L.C. (Nasha) appeals a judgment denying its petition for writ of mandate (Code Civ. Proc., § 1094.5),[1] wherein Nasha sought to overturn an adverse decision by the South Valley Area Planning Commission (Planning Commission).[2]

The essential issue presented is whether the Planning Commission's decision should be set aside due to an unacceptable probability of actual bias on the part of one of the decision makers.

While this matter was pending before the Planning Commission, one of its members authored an article attacking the project under consideration. Accordingly, Nasha's claim of bias is well founded. The judgment is reversed with directions.

## FACTUAL AND PROCEDURAL BACKGROUND

Nasha owns five legal lots on Multiview Drive, north of Mulholland Highway and east of Laurel Canyon. The lots, which are surrounded by single-family residences, range in size from 22,675 square feet to 46,244 square feet. Nasha seeks to develop the property with five new three-story single-family homes, with a maximum height of 36 feet and square footage ranging from 5,173 square feet to 6,648 square feet, including garages, decks and balconies. Each home also would have an outdoor pool.

The site of the project is located within an area subject to the Mulholland Scenic Parkway Specific Plan (Mulholland Plan). The stated purposes of the Mulholland Plan include preservation of the area's scenic features as well as preservation of the existing ecological balance and biologic features.

---

[1] All further statutory references are to the Code of Civil Procedure, unless otherwise indicated.

[2] In addition to the Planning Commission, Nasha named as defendants the City of Los Angeles (the City) and Tony Lucente (Lucente), in his capacity as a member of the Planning Commission. The Planning Commission, the City and Lucente are the respondents in this appeal.

Although it is asserted the site of the proposed project is not visible from Mulholland Highway, due to its geographic location within the boundaries of the Mulholland Plan, Nasha was required to file an application to determine the proposed development's compliance with the Mulholland Plan.

### 1. Administrative proceedings.

#### a. The mitigated negative declaration (MND).[3]

In November 2000, in accordance with the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.), the City Planning Department issued a proposed MND for the project. The Planning Department proposed an MND be adopted on the ground the mitigation measures which it outlined would reduce any potential significant adverse effects to a level of insignificance.

Thereafter, the Santa Monica Mountains Conservancy (Conservancy) submitted written comments. The Conservancy argued the proposed MND was deficient for inadequately addressing potential impacts to the wildlife movement corridor which connects Griffith Park to Fryman Canyon.

Various neighbors, including one Mark Hennessy (Hennessy), also submitted comments. Hennessy likewise contended the MND was deficient and complained the project would substantially interfere with deer and wildlife habitat, and would degrade wildlife migration.

In December 2000, based on comments submitted pertaining to the wildlife corridor, the Planning Department amended the proposed MND to include the following mitigation measure: "Provision of escape routes or wildlife corridors to allow resident wildlife access to uninhabited areas where they dwell, and monitoring of animal use of these escapes or corridors; [¶] Consultation with the Department of Animal Regulation, Wildlife Specialist or Supervisor, regarding animal relocation, design standards and management guidelines for escape routes or wildlife corridors; [¶] Mapping of these escape routes or

---

[3] " 'Mitigated negative declaration' means a negative declaration prepared for a project when the initial study has identified potentially significant effects on the environment, but (1) revisions in the project plans or proposals made by, or agreed to by, the applicant before the proposed negative declaration and initial study are released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur, and (2) there is no substantial evidence in light of the whole record before the public agency that the project, as revised, may have a significant effect on the environment." (Pub. Resources Code, § 21064.5.)

wildlife corridors with regards to their location, topography, and vegetation; and [¶] Post-construction landscape treatment to insure preservation of habitat for wildlife. Where habitat has been preserved, use of native plant materials is required."

> b. *The Mulholland Design Review Board (DRB) recommends disapproval.*

Nasha's application also was considered by the DRB, which is an advisory body. On December 14, 2000, the DRB recommended disapproval on the grounds that the size and massing were incompatible with the Mulholland Parkway environment, the flat roofs were incompatible, the retaining walls were too tall and long, and the development did not conform to the site. The DRB also recommended that an environmental impact report (EIR) be prepared for the project.

> c. *The City Director of Planning (Director) approves the project.*

On March 23, 2001, the Director, as the decision maker, conditionally approved Nasha's application and certified the MND. The Director determined that as conditioned, there were "no significant adverse impacts which have not been mitigated to a level of insignificance."

> d. *The appeal to the Planning Commission.*

In April 2001, the Conservancy and Hennessy, for himself and other neighborhood residents, appealed the Director's decision to the Planning Commission.

The Conservancy contended the project would result in significant unavoidable adverse impacts to wildlife movement in the eastern Santa Monica Mountains and habitat resources, the MND was inadequate, an EIR was required, and the proposed buildings were incompatible with the terrain.

Similarly, Hennessy asserted, inter alia, the Director's decision "creates a disastrous effect not only to the property itself, including the numerous wildlife species within this wildlife corridor canyon contained within this property, but also to the properties immediately adjacent . . . ."

The public hearing on the appeal was scheduled for June 28, 2001.

e. *Shortly before the Planning Commission hearing on the appeal, Commissioner Lucente authors an article hostile to the project.*

In advance of the Planning Commission hearing, the June 2001 issue of the Studio City Residents Association newsletter contained the following news update:

"**MULTIVIEW DRIVE PROJECT THREAT TO WILDLIFE CORRIDOR** [¶] A proposed project taking five legal lots totaling 3.8 acres for five proposed large homes with swimming pools served by a common driveway off Multiview Drive is winding its way through the Planning process. The Mulholland Design Review Board denied it unanimously. However, the Deputy LA City Planning Director overrode that denial. The Santa Monica Mountains Conservancy and the neighbors both appealed it to the South Valley Area Planning Commission. The Appeal hearing is set for June 28th after 4:30 pm in Van Nuys. (Please see Hearings/Meetings, Page Two.) [¶] After wildlife leaves Briar Summit heading eastward they must either head south towards Mt. Olympus or north to the slopes above Universal City. *The Multiview Drive site is an absolutely crucial habitat corridor.* Please contact Paul Edelman with the Conservancy at 310/ . . . or Mark Hennessy who lives adjacent to the project at 323/ . . . if you have any questions." (Italics added.)

The newsletter article was unsigned. Lucente later admitted in deposition he was the author.

f. *While the appeal to the Planning Commission was pending, Lucente introduced Hennessy to speak against the project at a neighborhood association meeting.*

In addition to serving on the Planning Commission, Lucente also was president of the Studio City Residents Association. In June 2001, during the pendency of the appeal to the Planning Commission, Lucente introduced Hennessy at the association's monthly meeting. At that meeting, Hennessy proceeded to speak against the project and in support of his appeal.[4]

---

[4] According to Lucente, he left the room for the duration of Hennessy's remarks.

g. *The June 28, 2001 hearing before the Planning Commission; no disclosure by Lucente of his authorship of the article or of his contact with Hennessy.*

On June 28, 2001, the matter came on for hearing before the Planning Commission. At the outset, Lucente made the following statement: "I did want to state that in another capacity, as president of the Studio City Residents Association, we have included information on this matter in our monthly newsletter at the request of one of our members, which is a routine thing that we do. And I have not, however, had any direct contact with the appellants, nor have I discussed this project in any substantive way with anyone involved in this. So, therefore, I feel I can make a fair and impartial decision regarding this matter."

An unidentified speaker then stated: "It doesn't impact you financially in any way."

Lucente responded: "And there is no financial impact in any way. Therefore, I will be hearing this matter. Thank you."

Thus, in Lucente's opening remarks, he did not disclose he in fact had authored the article which appeared in the association's June 2001 newsletter. Also, contrary to Lucente's characterization thereof, the newsletter article was not merely informational. The article advocated a position against the project, which it characterized as a "threat to wildlife corridor," and sought to rally residents to support the appeal to the Planning Commission.

Lucente's assertion he had not "had any direct contact" with any of the appellants likewise was inaccurate. As noted, earlier that month, Lucente had introduced Hennessy at an association meeting to speak against the project.

h. *At the conclusion of the hearing, Lucente brings a motion to grant the appeal.*

At the hearing, the Planning Commission heard from various speakers, including representatives of Nasha, the Conservancy, and various area residents, including Hennessy. Nasha took the position that the MND adequately addressed the issue of the wildlife corridor, a position which the Conservancy and neighboring homeowners disputed.

At the conclusion of the hearing, Lucente made a motion "to grant the appeal and find that the Director of Planning erred in the determination

regarding this project and that the findings could not be made to . . . deny the appeal based on the testimony that we had here tonight."

The motion was carried by a three-to-one vote.

### i. *Nasha's unsuccessful requests for reconsideration.*

On July 5, 2001, one week after the hearing, Nasha filed a request for reconsideration based on new facts relating to bias by Lucente. First, contrary to Lucente's statement at the June 28, 2001 Planning Commission hearing, Lucente did have ex parte contact with Hennessy, one of the appellants, whom Lucente had introduced at a June 12, 2001 meeting of the Studio City Residents Association. Further, at the Planning Commission hearing, Lucente had failed to disclose his role in the newsletter article opposing the project.

On July 12, 2001, Nasha reiterated its request for reconsideration in another letter to the Planning Commission, stating: "In order to protect even the perception of bias and conflict, the Commission should vote for reconsideration of this case, either for the purpose of allowing Commissioner Lucente to recuse himself or to request an opinion from the City Attorney pursuant to Charter Section 222."

The Planning Commission did not reconsider its decision.

### j. *The Planning Commission's findings.*

Four months after the hearing, the Planning Commission issued findings setting forth the basis for its decision overturning the Director's conditional approval of the project. The Planning Commission's decision indicated:

"1. The Commission arrived at its determination based upon its review of available records and evidence contained in the subject and related files and upon testimony and evidence provided at the Commission hearing on the subject matter.

"a. Based on a review of the building plans, landscape plans, and color palette, the five proposed buildings and associated landscaping are not compatible with the surrounding buildings and parkway environment for the following reasons: The Specific Plan states, per *Section 11.I.2.e.*, that the building or structure should conform to the surrounding buildings and parkway environment. In this case, the proposed houses are 'box like' with little articulation or stepping back. Furthermore, the visual massing and appearance resulting from the cumulative size of the homes and their

retaining wall structures would not be compatible with the appearance of existing houses in this neighborhood.

"b. On December 14, 2000, the City Planning Department Environmental Staff Advisory Committee issued a proposed Mitigated Negative Declaration (MND) No. 2000-3622-DRB (Article V-City CEQA Guidelines) and determined that by imposing conditions, the potential impacts resulting from the project would not have a significant impact on the environment. At the June 28, 2001, South Valley Area Planning Commission appeal hearing for this case, the Santa Monica Mountains Conservancy presented evidence that potentially significant impacts to the wildlife corridor would result from project implementation and that the proposed mitigation measures identified in the proposed Mitigated Negative Declaration No. 2000-3622-DRB were insufficient to reduce impacts to less than significant levels. The project, as proposed, would not preserve the natural vegetation, existing ecological balance and environmentally sensitive areas and the biologic features in conformance with Section 2.K. and L. of the Specific Plan. The potential impacts to the wildlife and the corridors were not adequately analyzed by the proposed Mitigated Negative Declaration No. 2000-3622-DRB and therefore it was determined to be inadequate.

"c. Project Permit Compliance Finding. The proposed project does not comply with the regulations, standards, and provisions of the Mulholland Scenic Parkway Specific Plan."

   2.  *Trial court proceedings.*

      a.  *Pleadings.*

On October 25, 2001, Nasha filed a first amended verified petition for writ of mandate to overturn the Planning Commission's decision (§ 1094.5), joined with causes of action for declaratory relief and temporary taking without just compensation.[5] Nasha named as defendants the City, the Planning Commission, and Lucente in his capacity as a planning commissioner.

Nasha alleged, inter alia, that the Planning Commission's reversal of the Director's approval of the project was arbitrary, capricious, an abuse of discretion, a denial of Nasha's fundamental right to a fair and impartial decision, and unsupported by substantial evidence.

With respect to Lucente's conduct, Nasha alleged his role in introducing Hennessy as a speaker against the project at a neighborhood association

---

[5] Nasha later filed a request for dismissal without prejudice of its declaratory relief and taking claims.

meeting, and his role in allowing publication of the newsletter article attacking the project while the matter was pending before the Planning Commission, reflected, at a minimum, a reasonable appearance of bias which required his recusal from hearing the matter. Further, to ensure that quasi-judicial decisionmaking is not tainted by even the reasonable appearance of bias and unfairness, Lucente's vote and the Planning Commission's decision should be set aside.

Additionally, Nasha alleged the Planning Commission failed to act in the manner required by law in various respects, including failing to make certain necessary findings and in misinterpreting the Mulholland Plan; and the Planning Commission's decision was not supported by substantial evidence, in that, inter alia, the MND was adequate to protect wildlife access.

### b. *Lucente's deposition.*

On January 18, 2002, during the pendency of the mandamus proceedings, Nasha took Lucente's deposition. In the deposition, Lucente admitted he authored the newsletter article, that he had spoken to Hennessy before the association meeting and that he introduced Hennessy at that meeting.[6]

### c. *The City's opposition.*

The City filed opposition papers, asserting substantial evidence supported the Planning Commission's findings, the decision was principled and followed a clear analytical path, the Planning Commission duly relied on applicable provisions of the Mulholland Plan, and the attack on Lucente was spurious.

The City emphasized Lucente had no financial interest, he was not the sole decision maker, and the standard for disqualification was not an appearance of bias but a *probability* of actual bias, a standard that was not met here.

### d. *Trial court's rulings and judgment.*

On July 26, 2002, the matter came on for hearing. The trial court rejected Nasha's claim of bias arising out of Lucente's prehearing involvement

---

[6] The deposition transcript includes the following colloquy:
"Q And you didn't know what [Hennessy] was going to say?
"A I knew that he was going to speak about this project.
"Q And you told Mr. Hennessy that you would introduce him to speak?
"A Yes.
"Q And did you introduce Mr. Hennessy to speak?
"A Yes, I did."
Lucente then added that he left the room and did not listen to Hennessy's remarks.

attacking the project, stating: "I am going to reject [Nasha's] argument . . . . I think that [Nasha] either knew or had reason to believe at the administrative level that this guy had something to do with that, with the writing of that article, and therefore should—has not shown sufficiently that this argument could not have been made in the exercise of due diligence at the administrative level and therefore is precluded from urging disqualification for the first time here in court on the basis that he wrote that. *And I don't think there's enough to show that he must be disqualified if he did not write it.* So I'm not going to permit any further briefing or argument with respect to that." (Italics added.)[7]

The trial court then continued the matter to allow supplemental briefing on the sole issue of whether the Mulholland Plan applies to development projects that are not visible from Mulholland Drive.

On September 26, 2002, the trial court denied Nasha's petition for writ of mandate, ruling that the Mulholland Plan is applicable irrespective of whether a project is visible from Mulholland Drive, and that substantial evidence supported the administrative decision "that the large homes that [Nasha] intended to construct upon the 5 lots were out of scale and character with, and incompatible with, the surrounding neighborhood."

On April 11, 2003, the trial court entered judgment in favor of the City, the Planning Commission and Lucente.

Nasha filed a timely appeal from the judgment denying its petition for writ of mandate.

## CONTENTIONS

Nasha contends: the Planning Commission's decision should be set aside because Commissioner Lucente's prehearing actions attacking the project constituted actual bias; the Planning Commission's decision is not supported by substantial evidence; the Planning Commission failed to make any of the required findings to support its decision; the stated purpose for a design review process in the Mulholland Plan is to review projects that are visible from Mulholland Drive; and the Planning Commission's decision reversing the Director's approval of the MND was unsupported by substantial evidence.

---

[7] As indicated, Lucente admitted he wrote the article. Therefore, the trial court's comment "I don't think there's enough to show that he must be disqualified if he did not write it" did not speak to the issue. Further, the trial court faulted Nasha for raising the issue of Lucente's bias for the first time at the superior court level. However, as set forth above, the record reflects Nasha did raise the issue of bias at the administrative level—Nasha promptly requested reconsideration on that basis before the Planning Commission, *twice*, to no avail.

## DISCUSSION

1. *Standard of review.*

The petition for superior court review of the final administrative decision by the Planning Commission was brought pursuant to section 1094.5. "The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of jurisdiction; *whether there was a fair trial*; and whether there was any prejudicial abuse of discretion." (§ 1094.5, subd. (b), italics added.)

■ A challenge to the procedural fairness of the administrative hearing is reviewed de novo on appeal because the ultimate determination of procedural fairness amounts to a question of law. (*Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1169–1170 [56 Cal.Rptr.2d 223]; *Anserv Ins. Services, Inc. v. Kelso* (2000) 83 Cal.App.4th 197, 205 [99 Cal.Rptr.2d 357].)

2. *Nasha has shown an unacceptable probability of actual bias.*

a. *Procedural due process principles apply to quasi-judicial decisionmaking.*

■ As explained in *Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1188 [52 Cal.Rptr.2d 518], "In considering the applicability of due process principles, we must distinguish between actions that are legislative in character and actions that are adjudicatory. In the case of an administrative agency, the terms 'quasi-legislative' and 'quasi-judicial' are used to denote these differing types of action. Quasi-legislative acts involve the adoption of rules of general application on the basis of broad public policy, while quasi-judicial acts involve the determination and application of facts peculiar to an individual case. [Citations.] Quasi-legislative acts are not subject to procedural due process requirements while those requirements apply to quasi-judicial acts regardless of the guise they may take. [Citations.]"

Here, the proceeding before the Planning Commission was quasi-judicial in nature, rather than quasi-legislative, because the matter involved the determination and application of facts peculiar to an individual case, rather than the adoption of rules of general application on the basis of broad public policy. (*Beck Development Co., supra,* 44 Cal.App.4th at p. 1188.) Accordingly, procedural due process principles are applicable. (*Ibid.*)

b. *Procedural due process requires a reasonably impartial, noninvolved decision maker.*

■ Procedural due process in the administrative setting requires that the hearing be conducted " ' *"before a reasonably impartial, noninvolved reviewer."* ' " (*Gai v. City of Selma* (1998) 68 Cal.App.4th 213, 219 [79 Cal.Rptr.2d 910], italics added.) As this court observed in *Nightlife Partners, Ltd. v. City of Beverly Hills* (2003) 108 Cal.App.4th 81 [133 Cal.Rptr.2d 234], "the broad applicability of administrative hearings to the various rights and responsibilities of citizens and businesses, and the undeniable public interest in fair hearings in the administrative adjudication arena, militate in favor of assuring that such hearings are fair." (*Id.*, at p. 90.)

c. *The nature of the required showing: an unacceptable probability of actual bias.*

■ The "standard of impartiality required at an administrative hearing is less exacting than that required in . . . judicial proceeding[s]." (*Gai v. City of Selma, supra,* 68 Cal.App.4th at p. 219.) It is recognized that "administrative decision makers are drawn from the community at large. Especially in a small town setting they are likely to have knowledge of and contact or dealings with parties to the proceeding. Holding them to the same standard as judges, without a showing of actual bias or the probability of actual bias, may discourage persons willing to serve and may deprive the administrative process of capable decision makers." (*Id.*, at p. 233.)

■ Therefore, in order to prevail on a claim of bias violating fair hearing requirements, Nasha must establish " 'an unacceptable probability of actual bias on the part of those who have actual decisionmaking power over their claims.' " (*BreakZone Billiards v. City of Torrance* (2000) 81 Cal.App.4th 1205, 1236 [97 Cal.Rptr.2d 467].) A party seeking to show bias or prejudice on the part of an administrative decision maker is required to prove the same "with concrete facts: ' "[b]ias and prejudice are never implied and must be established by clear averments." ' " (*Id.*, at p. 1237; accord, *Hongsathavij v. Queen of Angels etc. Medical Center* (1998) 62 Cal.App.4th 1123, 1142 [73 Cal.Rptr.2d 695].)

d. *Nasha has shown an unacceptable probability of actual bias based on Lucente's authorship of the newsletter article attacking the project.*

The newsletter article by Lucente, attacking the project as a "threat to wildlife corridor," gives rise to an unacceptable probability of actual bias.

We reiterate portions of the offending article for emphasis: "**MULTIVIEW DRIVE PROJECT THREAT TO WILDLIFE CORRIDOR** [¶] A proposed project taking five legal lots totaling 3.8 acres for five proposed large homes with swimming pools served by a common driveway off Multiview Drive is winding its way through the Planning process. . . . [¶] After wildlife leaves Briar Summit heading eastward they must either head south towards Mt. Olympus or north to the slopes above Universal City. *The Multiview Drive site is an absolutely crucial habitat corridor.* Please contact Paul Edelman with the Conservancy at 310/ . . . or Mark Hennessy who lives adjacent to the project at 323/ . . . if you have any questions." (Italics added.)

Contrary to the position taken by Lucente, the newsletter article was not merely informational. The article clearly advocated a position against the project, which it characterized as a "threat to wildlife corridor."

■ Lucente's authorship of the newsletter article gave rise to an unacceptable probability of actual bias and was sufficient to preclude Lucente from serving as a " ' "reasonably impartial, noninvolved reviewer." ' " (*Gai v. City of Selma, supra,* 68 Cal.App.4th at p. 219.) Lucente clearly should have recused himself from hearing this matter. His participation in the appeal to the Planning Commission requires the Commission's decision be vacated.[8,9]

e.   *There was no waiver by Nasha.*

In an attempt to salvage the Planning Commission's decision, respondents contend Nasha waived the issue of Lucente's bias by failing to raise the issue at the administrative level. (*NBS Imaging Systems, Inc. v. State Bd. of Control* (1997) 60 Cal.App.4th 328, 337 [70 Cal.Rptr.2d 237] [superior court erred in granting relief based on legal theory not presented during administrative proceedings].) The trial court was persuaded by this position, finding Nasha was precluded from raising the issue of Lucente's bias for the first time at the superior court level. The trial court's finding of waiver is erroneous, both factually and legally.

---

[8] Respondents have emphasized that Lucente was not the sole decision maker. However, any attempt to characterize Lucente's participation as somehow harmless is meritless. Lucente's vote was decisive. The Planning Commission's vote was three to one in favor of overturning the Director's approval of the project, with Lucente voting with the majority. Had Lucente duly recused himself, there would have been only two votes to overturn the Director's decision. Because the votes of three commissioners were required to overturn the Director's decision (L.A. City Charter, § 503(c)), absent Lucente, the administrative appeal would have failed. Therefore, Lucente's involvement clearly affected the outcome of the administrative appeal.

[9] Because Lucente's authorship of the newsletter article, standing alone, is sufficient to give rise to an unacceptable probability of actual bias, it is unnecessary to address Nasha's arguments relating to Lucente's undisclosed ex parte contact with Hennessy.

#### (1) *Nasha initially challenged Lucente's bias at the administrative level.*

The record establishes that Nasha in fact did raise the issue of bias at the administrative level. As indicated, on July 5, 2001, one week after the Planning Commission hearing, Nasha filed a request for reconsideration based on new facts relating to bias by Lucente, specifically, Lucente's undisclosed ex parte contact with Hennessy, and Lucente's undisclosed authorship of the newsletter article attacking the project.

Thereafter, on July 12, 2001, Nasha reiterated its request for reconsideration in another letter to the Planning Commission, stating: "In order to protect even the perception of bias and conflict, the Commission should vote for reconsideration of this case, either for the purpose of allowing Commissioner Lucente to recuse himself or to request an opinion from the City Attorney pursuant to Charter Section 222."

In view of the above, the trial court's ruling that Nasha raised the issue of Lucente's bias for the first time at the superior court level is contrary to the record.

#### (2) *Superior court may consider evidence not presented at administrative level relating to procedural fairness.*

■ Where the issue on administrative mandamus is whether the administrative hearing was procedurally fair, "the trial court may consider evidence not presented at the administrative hearing if the evidence addresses the petitioner's claim that he or she was denied due process or a fair hearing at that hearing. [Citations.]" (*Nightlife Partners, Ltd. v. City of Beverly Hills, supra,* 108 Cal.App.4th at pp. 89–90.) Section 1094.5, subdivision (e), enables the trial court to admit relevant evidence that, in the exercise of reasonable diligence, could not have been produced at the administrative hearing. Here, it was only in the course of the superior court action that Nasha had the opportunity to take Lucente's deposition to fully develop the issue of bias. Therefore, such evidence properly was before the trial court in the mandamus proceeding and is entitled to due consideration.

### 3. *Remaining issues not reached.*

Because the Planning Commission's decision was tainted by bias and must be vacated, it is unnecessary to address Nasha's other contentions.

## DISPOSITION

The judgment is reversed with directions to issue a writ of mandate vacating the Planning Commission's decision and directing the Planning Commission to conduct a new hearing on the appeal from the Director's decision, before an impartial panel. Nasha shall recover its costs on appeal.

Croskey, J., and Kitching, J., concurred.