Filed 9/11/20  O.L. v. State Dept. of Social Services CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| O.L.,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>STATE DEPARTMENT OF SOCIAL SERVICES,<br><br>    Defendant and Respondent. | A155657<br><br>(Contra Costa County<br>Super. Ct. No. MSN17-1782) |

Appellant O.L. (Mother) appeals from the trial court's denial of a petition for an administrative writ of mandate, challenging a decision of the Department of Social Services (DSS) to deny her son in-home supportive services.  Mother contends the trial court applied the wrong standard of review, erred in finding her administrative hearing was fair, and erred in concluding the evidence supported the findings.  We affirm.

## I.  PROCEDURAL AND FACTUAL BACKGROUND

In-Home Supportive Services (IHSS) is a program that provides in-home supportive services to help elderly and disabled individuals remain safely in their homes.  (Welf. & Inst. Code, § 12300 et seq.)  The DSS is responsible for overseeing IHSS in compliance with state and federal laws.  County welfare departments administer the program under the DSS's general supervision, process applications, and determine which supportive

services a recipient needs, as well as the number of hours he or she will receive for each authorized service.  (Welf. & Inst. Code, §§ 12301.1, 12309; *Basden v. Wagner* (2010) 181 Cal.App.4th 929, 934.)

In January 2013, Mother filed an application with Contra Costa County (County) seeking IHSS, including personal services and protective supervision, for her son, G.L.  Protective supervision is one of the supportive services provided under the IHSS program and is "available for observing the behavior of nonself-directing, confused, mentally impaired, or mentally ill persons only."  (State Dept. Social Services, Manual of Policies and Procedures (MPP) §§ 30-757.17, 30-757.171; *Reilly v. Marin Housing Authority* (2020) ___ Cal.5th ___, ___ [2020 WL 5103649, at p. *3]; *Norasingh v. Lightbourne* (2014) 229 Cal.App.4th 740, 745.)

Mother's January 2013 application for protective supervision was initially denied based on "lack of assessed need."  An administrative law judge (ALJ) upheld the denial, but after Mother filed a petition for writ of administrative mandate in the Contra Costa Superior Court, the trial court ordered the DSS to vacate the denial and reassess G.L. to determine if his conduct was self-directed.  In ordering the further assessment, the trial court stated "[t]he social worker did not assess the claimant's son directly for non-self-directed behavior" and there was "insufficient evidence in the record to determine whether GL engages in non-self-directing behavior, as required for receiving protective supervision services."  On March 7, 2016, the DSS vacated the denial and ordered the County to reassess G.L. for protective supervision.

According to her case notes, County social worker Charice Hornsby contacted Mother to schedule a reassessment.  On March 8, 2016, Hornsby left a message with Mother's husband that she needed to assess G.L. and his

2

brother on March 23 at 10:30 a.m. Mother called back and told Hornsby she would only make G.L.'s brother available that day. On March 15, Hornsby left Mother a voicemail to tell her that she needed to make both G.L. and his brother available. Three days later Mother responded she would only make G.L.'s brother available. Hornsby returned Mother's call the same day, saying the appointment would only happen if she could see both children.

On March 22, 2016, Mother returned Hornsby's call and stated that she would only keep G.L.'s brother home. Hornsby called Mother back, but Mother did not answer her phone. Hornsby left a message that she would need to see both boys. Thirty minutes later, Hornsby called Mother again using a personal cell phone and blocked the number. Mother answered the phone. On the call, Mother claimed not to have received Hornsby's message. When Hornsby reminded Mother she had returned Hornsby's calls each time and referenced the message left with her husband, Mother said the appointment was too soon and insisted Hornsby could only see G.L.'s brother. Mother stated Hornsby should have sent her a certified letter to inform her of the appointment. Hornsby responded that due to time constraints, telephone was the most "prompt" way to schedule the appointment. Mother then refused Hornsby's request to schedule an appointment on either March 23 or 25, or the following week when the children were on spring break.

Hornsby sent an appointment letter to Mother on March 22, scheduling an appointment for April 8 at 11:00 a.m. The letter informed Mother the social worker may arrive up to one hour before or one hour after the appointment time. The letter requested the completion of a physical evaluation form and a copy of G.L.'s most recent individual education plan

(IEP) and individual program plan (IPP)[1] by April 12, 2016.  On March 24, Hornsby left Mother another voicemail, reminding Mother of the April 8 appointment and requesting the IEP and IPP by April 12.  On March 25, and again on March 29, Mother called Hornsby multiple times to confirm G.L. would be available for the appointment on April 8.

A written narrative, attached to an IHSS "Needs Assessment Form," describes Hornsby's visit to Mother's home to assess G.L. on April 8. Hornsby arrived at the home at 10:20 a.m. When Hornsby stepped into the home, Mother guided her back outside by placing her hand on Hornsby's shoulder, and closed the front door behind her, forcing Hornsby to step out of the home.  When Hornsby asked to observe G.L., Mother stated he had a headache and escorted Hornsby to his bedroom.  Hornsby noted that G.L. was under a blanket and appeared to be sleeping, but she did not see him.

Mother then escorted Hornsby outside of the home to a shed where the interview took place.  Hornsby asked Mother questions about G.L.'s behavior, and Mother showed Hornsby videos of G.L. jumping on the couch, covering his ears and rocking, playing with a toilet, organizing hand soap, running towards Mother, and chewing while holding a full can of Play-Doh.  Hornsby

---

[1] An IEP is a "written statement for the child developed in a participatory process involving parents and school personnel" that "describes the child's needs, academic and functional goals, and a statement of the special education, related services, and program modifications and accommodations that will be provided." (*B.H. v. Manhattan Beach Unified School Dist.* (2019) 35 Cal.App.5th 563, 570.)  An IPP is a plan developed by a team that includes the individual with a developmental disability, his or her legally authorized representative, and one or more regional center representatives, designed to "maximize opportunities for the individual to be part of community life; enjoy increased control over his or her life; acquire positive roles in community life; and develop the skills to accomplish the same." (*Capitol People First v. State Dept. of Developmental Services* (2007) 155 Cal.App.4th 676, 683.)

4

could not tell if the videos displayed G.L.'s customary behavior or if he had been asked to perform the tasks.

Hornsby told Mother again that she needed to observe G.L. directly. Hornsby was escorted back into the home by Mother and attempted to observe G.L. in the doorway of the living room but could not see him. Mother told Hornsby that G.L. was " 'hiding cause he knows you're here.' " She then placed her hand on Hornsby's shoulder and turned her around and out the door. Hornsby tried to explain why she was standing in the doorway trying to observe G.L., but Mother said she did not want G.L.'s brother to get out, said "bye" to Hornsby, and closed the door. Hornsby had made three requests to Mother to directly observe G.L. but was unable to do so. At the assessment, Hornsby had also asked Mother to provide G.L.'s most recent psychological evaluation, IEP, and IPP.

On April 26, 2016, Hornsby told Mother on the phone that she had not received copies of documents requested at the April 8 visit, including the most recent IEP and IPP for G.L. Mother said she had been " 'really busy' " dealing with the school district and did not think she would have time to get the documents to Hornsby. Hornsby informed Mother that she needed to complete the case by April 29. Hornsby sent Mother another letter on May 3, requesting G.L.'s IEP and IPP.

On May 5, 2016, Mother's application for IHSS was again denied based on a lack of need for services and a lack of information necessary to determine if G.L. was entitled to services. Mother requested a hearing before an ALJ. At the hearing on August 25, 2016, the ALJ heard testimony from (1) Mother, (2) a respite worker, Derail Hill, and (3) Philip Evans, the County's representative. The ALJ issued a decision upholding the County's denial of IHSS. The decision stated: "The evidence establishes that despite

the [social worker's] repeated requests, she was unable to personally observe GL at the April 8, 2016, home visit, and that [Mother] actively prevented the [social worker] from doing so. Although [Mother] denied being told by the [social worker] that direct observation of GL was necessary, I do not find [Mother's] testimony credible. It conflicts with the contemporaneous written account of the [social worker], and defies established practice in the conduct of needs assessments." The ALJ further observed that Mother "failed to provide complete copies of the most recent IEP and IPP as twice requested by the [social worker]. The documents [Mother] provided were fragmentary excerpts which do not allow a fair evaluation of GL's behavior and a comparison with [Mother's] description."

Mother filed a second petition for writ of administrative mandate in the trial court in September 2017. The superior court held a hearing on the petition and denied it in September 2018. This appeal followed.

## II. DISCUSSION

### A. *The Trial Court Applied the Correct Standard*

Citing *Nasha v. City of Los Angeles* (2004) 125 Cal.App.4th 470, 482, Mother first contends the trial court erred by applying the independent judgment standard in assessing whether she received a fair administrative hearing, rather than reviewing the question de novo. We reject the claim because the record does not reflect the trial court applied the incorrect standard.

We will presume the court applied the law correctly in absence of an affirmative showing to contrary, and Mother does not identify any statement in the trial court's ruling suggesting it applied the independent judgment standard of review to the issue of procedural fairness. (Evid. Code, § 664; *Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609 [fundamental principle of

6

appellate review is presumption that trial court's judgment is correct, and burden is on appellant to demonstrate reversible error on the basis of the record].)  Mother points to the trial court's discussion of the independent judgment standard in its order, but the trial court, citing *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817 (*Fukuda*), stated it must exercise its independent judgment "[i]n determining whether the administrative findings are contrary to the weight of the evidence," not in determining whether the hearing was fair.  Regardless, as Mother concedes, on appeal we review de novo whether she received a fair administrative hearing, rendering irrelevant the question whether the trial court applied the correct standard of review.  (*Nasha v. City of Los Angeles*, *supra*, 125 Cal.App.4th at p. 482; *Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1169 [question whether appellant received a fair hearing is question of law on which " ' "trial and appellate courts perform essentially the same function and the conclusions of the trial court are not conclusive on appeal" ' "].)  For reasons explained below, we conclude Mother has not established she received an unfair administrative hearing.

## B.  *Fairness of the Administrative Hearing*

Mother next argues her administrative hearing was unfair because the County social worker (Hornsby) was not present at the hearing and did not provide any testimony or declaration under oath on which she could be cross-examined.  Mother notes that the County bears the burden of proof to support its determination, and the only evidence offered by the County was an unsigned, unsworn four-page narrative regarding the social worker's visit to Mother's home on April 8, 2016 and the testimony of Philip Evans, the County representative who was not present at the visit.  Mother contends the

failure of the County to make Hornsby available for cross-examination was a violation of her due process rights.

We conclude Mother has failed to show her due process rights were violated because she has not shown she was denied the opportunity to cross-examine Hornsby.  A party " 'may not complain of the absence of a witness unless he has made a showing of due diligence to obtain the attendance of the witness.' " (*Nick v. Department of Motor Vehicles* (1993) 12 Cal.App.4th 1407, 1417; *Mackler v. Alexis* (1982) 130 Cal.App.3d 44, 61 [licensee's due process right to cross-examine police officer was adequately protected by his "obvious entitlement to produce evidence controverting [the officer's] statement at the hearing and, if he so chooses, he could call the arresting officer himself"].)  Moreover, in civil cases, the right to cross-examine witnesses may be waived if the right is not timely asserted or exercised.  (*In re Marriage of S.* (1985) 171 Cal.App.3d 738, 745 ["a person may waive the right of cross-examination"]; *In re Marriage of Binette* (2018) 24 Cal.App.5th 1119, 1132 [rejecting husband's due process challenge when he failed to object to wife's declaration or ask to cross-examine her on it].)

Here, Mother had the right to subpoena witnesses to compel their attendance at the administrative hearing.[2]  (Gov. Code, § 11513; MPP, § 22-049.7.)  Indeed, Mother requested we take judicial notice of the rules allowing her to examine, cross-examine, and bring witnesses to the hearing.  Mother could have protected her right to cross-examine Hornsby by subpoenaing her, requesting a continuance to do so, or asking the court to order the social

---

[2] Mother's unopposed request for judicial notice of sections 22-049.7 and 22-073.3 of the MPP is granted.  (Evid. Code, §§ 452, subd. (b), 459, subd. (a).)

8

worker to appear.[3]  If Mother wanted to question Hornsby at the hearing, she had the obligation to attempt to procure her testimony.

Mother also contends the ALJ improperly shifted the burden of proof by relying on the unsigned, unsworn, unauthenticated social worker narrative. But Mother failed to raise that argument in the trial court.  Generally, appellate courts will not consider issues not raised before the trial court.  (*In re S.B.* (2004) 32 Cal.4th 1287, 1293; *Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1381.)  Even if Mother had raised the issue in the trial court, we would reject her argument because she failed to object to Hornsby's narrative when it was entered as evidence at the administrative hearing.  Accordingly, Mother waived her objections to the admission of the evidence.  (Evid. Code, § 353, subd. (a); see *SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 563.)  Moreover, under DSS regulations, the County was permitted to rely on the social worker's interview or report in assessing the need for protective services. (MPP, § 30-757.173, subd. (a)(2).)  Given that the County was specifically authorized to utilize the social worker's report in making the protective supervision assessment, both the ALJ and trial court appropriately considered it.

### C.  *The Findings Are Supported by the Evidence*

Finally, Mother challenges the trial court's findings that the evidence introduced at the administrative hearing supported the decision.  Mother again argues the only evidence that was introduced by the County to prove that Mother denied the social worker a chance to observe G.L. in person was

---

[3] Mother makes the conclusory argument, unsupported by any reference to the record, that she was "precluded from putting the social worker's credibility at issue."  Because Mother fails to explain this contention or support it with evidence in the record, we disregard it.

the unsworn, unauthenticated four-page narrative and the testimony of Evans, who was not present at the visit. Mother asserts the narrative, "simply [is] not enough, even under the independent judgment standard, for the trial court to find the ALJ's decision was based on substantial evidence."

As an initial matter, as already discussed above, Mother waived her objections to the admissibility and reliability of the sworn statement by failing to object at the administrative hearing.

Moreover, even on the merits, Mother's claim fails. When an adjudicatory decision of a state agency deprives a person of a fundamental vested right, including welfare benefits like IHSS protective supervision, the trial court must review the agency's factual findings under the independent judgment standard of review. (See *Bixby v. Pierno* (1971) 4 Cal.3d 130, 143.) Under that standard, the trial court starts with a strong presumption the administrative findings are correct, and substitutes its own findings only if that presumption is overcome. (*Fukuda, supra*, 20 Cal.4th at pp. 817–819.) The burden of proof rests on the petitioner to establish administrative error. (*Id.* at p. 817.) The appellate court then reviews the trial court's decision to determine if its findings are supported by substantial evidence. (*Id.* at p. 824.)

Here, the trial court's findings are supported by substantial evidence. In denying the writ, the trial court upheld the ALJ's finding that Mother failed to make G.L. available for an in-person assessment. The ALJ had relied on the "contemporaneous written account" of Hornsby as evidence "that despite the [social worker's] repeated requests, she was unable to personally observe GL at the April 8, 2016 home visit, and that [Mother] actively prevented the [social worker] from doing so." As discussed above, the social worker's narrative described her home visit and her three unsuccessful

10

requests to Mother to observe G.L., as well as Mother's active interference with her attempted observation by pushing Hornsby out the door twice. The trial court properly presumed the correctness of this finding and found no evidence was presented to the contrary.

Importantly, this finding was also supported by Mother's own testimony. Mother testified that Hornsby saw G.L. running and stated, "She has seen him, but I do not know about observe." Mother again stated that Hornsby saw G.L. running, "But observing for ten minutes or anything like that, I—I will say no." Moreover, the finding that Mother actively prevented Hornsby from observing G.L. during the home visit is consistent with Mother's repeated failure to cooperate in scheduling the home visit and provide documentation requested by the social worker. Hornsby's case notes reflect that despite multiple attempts to confirm with Mother prior to her visit that she would need to observe G.L., Mother insisted only his brother would be available at the home visit.

Further, Mother's admission that her older son was granted protective supervision following the home visit further supports the trial court's conclusion that the social worker tried to observe G.L. but was prevented from doing so by Mother. Mother fails to explain how Hornsby was able to assess her older son and grant him protective supervision, but unable to assess G.L. at the same home visit, if not for Mother's interference.

Mother notes that the ALJ found her not credible because her testimony conflicted with the narrative and the established practice of the County in conducting needs assessments, and argues "[t]his rationale, if applied universally" would mean anyone who contradicts established practices would not be credible and effectively serves as complete immunity for the County. This argument ignores the ALJ's finding that Mother's

testimony conflicted not just with established practices, but with the detailed account of the social worker's narrative. Nor are we considering whether to apply this rationale universally, but only whether the trial court's ruling upholding the decision in this case was supported by substantial evidence.

In sum, for the reasons discussed above, substantial evidence supports the trial court's affirmation of the agency's determination that Mother failed to make G.L. available for an in-person assessment in connection with the requested IHSS protective supervision.[4]

### III. DISPOSITION

The judgment is affirmed. Respondent is to recover its costs on appeal.

---

[4] The trial court also found denial of IHSS was supported by Mother's failure to provide requested documentation, including an IEP and IPP. Mother contends the court could not rely on that evidence, because DSS relied exclusively on Mother's refusal to allow the social worker to see G.L. in person in its argument at the administrative hearing. We need not consider this issue as we find substantial evidence supports the determination IHSS was properly denied because Mother failed to make G.L. available for an in-person evaluation that was essential to qualify for services.

12

MARGULIES, ACTING P. J.

WE CONCUR:

BANKE, J.

SANCHEZ, J.

A155657
*O.L. v. State Department of Social Services*