Filed 10/3/25  Ramakrishnan v. Stamos CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| RAVICHANDRAN RAMAKRISHNAN, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> MICHAEL STAMOS et al., <br><br> Defendants and Respondents. | G063698 <br><br> (Super. Ct. No. 30-2022-01277788) <br><br> O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Andre De La Cruz, Judge. Affirmed.

Ravichandran Ramakrishnan, in pro. per., for Plaintiff and Appellant.

Reed Smith, Raymond A. Cardozo and Kathryn M. Bayes for Defendants and Respondents.

\* \* \*

Plaintiff and appellant Ravichandran Ramakrishnan (Appellant) was a former resident at the medical school operated by defendants and respondents Dr. Michael Stamos et al., at the University of California, Irvine (UCI). Appellant was in the Radiation Oncology Residency Training Program (the Program). After a lengthy review process, the Program dismissed Appellant for performance deficiencies. Claiming that his dismissal was the result of retaliation and bias, Appellant filed a petition for a writ of administrative mandamus (Code Civ. Proc., § 1094.5)[1] and mandamus (§ 1085) in the trial court. The court denied the petition, and Appellant filed the instant appeal.

We conclude there was no reversible error. Appellant was afforded a fair proceeding, his due process rights were not violated, and there was no abuse of discretion in UCI's decision. Accordingly, we affirm the order.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

"In every appeal, 'the appellant has the duty to fairly summarize all of the facts in the light most favorable to the judgment.'" (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 739; *Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1658.) "'Further, the burden to provide a fair summary of the evidence "grows with the complexity of the record. [Citation.]'" [Citations.] To meet its burden on appeal to show a finding of fact is not supported by substantial evidence, appellants cannot recite only evidence in their favor, but must "'set forth in their brief *all* the material evidence on the point and *not merely their own evidence.* Unless this

---

[1] Subsequent statutory references are to the Code of Civil Procedure unless otherwise indicated.

2

is done the error is deemed to be waived."'" (*Slone v. El Centro Regional Medical Center* (2024) 106 Cal.App.5th 1160, 1173.)

Overall, we find Appellant has not met this standard, typically presenting only the facts that he believes support his argument and minimizing or ignoring contrary facts. While we could deem several of his arguments waived as a result, we exercise our discretion to rule on the merits of Appellant's claims.[2]

Despite our decision to overlook Appellant's highly one-sided statement of facts, additionally, he sometimes states "facts" that are simply not in the record, or lack record citations. We disregard such statements. (See Cal. Rules of Court, rule 8.204(a)(1)(C); *Schubert v. Reynolds* (2002) 95 Cal.App.4th 100, 109; *McComber v. Wells* (1999) 72 Cal.App.4th 512, 522.)

A. *General Background*

The Accreditation Council for Graduate Medical Education (ACGME) is the accrediting body for medical school programs, among other things. ACGME has set six "[c]ore [c]ompetencies" for residents: Professionalism, Patient Care and Procedural Skills, Medical Knowledge, Practice-based Learning and Improvement, Interpersonal and Communication Skills, and Systems-based Practice.

ACGME requires each institution to have a Clinical Competency Committee (CCC) comprised of active teaching faculty to review the progress of all residents and advise the program director.

---

[2] Given that this is not the only time Appellant may appear before this court, he should deem this a warning that in the future, we do not intend to overlook such deficiencies. Regardless of the fact that he is self-represented, he must follow the same procedural rules as an attorney. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246–1247.)

3

The program director "is the ultimate arbiter of whether a resident or fellow will enter unsupervised practice. The program will perform the majority of the assessments that will inform the final entrustment decision to graduate a resident or fellow from the program. This accountability cannot be over-emphasized: professional self-regulation depends heavily on the judgment of training programs, as manifest by the final evaluation and entrustment made by the program director." Further "[t]he program director is the final decision maker."

With respect to evaluations and feedback, ACGME states that faculty "must be encouraged to provide candid and robust evaluations that are reflective of actual performance. Evaluations are based on each faculty member's observations, judgments, and expectations. A faculty member should complete evaluations in an honest and good-faith effort to provide feedback to the resident/fellow with the goal of identifying both strengths and deficiencies in order for the resident/fellow to improve academic performance."

B. *UCI's Due Process Policy*

UCI has adopted an "Academic Due Process and Leave Policy" (the Policy). The goal of the Policy is for residents to "have a clear, understandable process to invoke in situations where questions arise about their ability to complete their post-graduate training due to academic, patient care or conduct issues." Under the Policy, "Academic Deficiency" is defined as "unacceptable conduct or performance, including failure to achieve expected performance, progress or maintain good standing in the [medical] training program, and/or maintain professional standards of conduct at any affiliated training site."

1. Nonreviewable Actions

Some actions are not reviewable under the Policy, including letters of concern and probation. The program director may issue a letter of concern to a resident who is not performing satisfactorily. The program director has discretion to issue such a letter when informal counseling is not an adequate remedy. The letter "should describe the nature of the deficiency and any necessary remedial actions required." The program director should review the letter with the resident. Such letters are not considered discipline, but the failure to improve may lead to additional action.

Additionally, the program director has discretion to place a resident on probation, which is used "for [residents] whose academic or professional deficiencies place the [resident] in jeopardy of not successfully completing the requirements of a [medical] training program." The conditions of probation must be communicated to the resident in writing, and should include details about the reasons for probation and required remedial activity. As noted, neither letters of concern nor probation is a reviewable event under the Policy.

2. Reviewable Actions

Under the policy, a resident may seek review by the CCC of certain academic actions. With respect to annual evaluations, "Only evaluations that result in an overall grade of unsatisfactory or marginal are eligible for review by departmental CCCs. [Residents] will be notified by the Program Director of any overall marginal or unsatisfactory evaluations before letters are sent to the trainees' specialty/subspecialty board." An overall unsatisfactory evaluation is defined as the resident being rated deficient in all six ACGME core competencies.

To appeal an annual evaluation, the resident must submit a written statement to the CCC, and the CCC appoints an ad hoc committee to review it. Following the review, the committee may make recommendations to the program director, who makes the final determination as to whether a resident should be placed on probation, or given notice of intended dismissal from the Program.

A resident may also appeal dismissal from the Program. The program director may dismiss a resident based on his or her discretion due to academic deficiencies, including a failure to maintain the standards of the Program, a serious act or omission compromising patient care, and "[u]nprofessional, unethical, or other behavior that is otherwise considered unacceptable by [the Program]."

The program director provides the resident with a notice of intent to dismiss, which "include[s] a statement of the reason(s) for the intended dismissal, a copy of materials upon which the intended dismissal is based, and a statement that the [resident] has a right to respond in writing to the Chair within ten (10) calendar days of receipt of the notice."

After dismissal, there are three levels of review. Level One is an informal review, Level Two is a formal review, and Level Three is a decision by the Dean. (We shall discuss the details of each level below as necessary.)

C. *Appellant's Academic Performance in Second Year of Residency*

Appellant transferred to the Program on August 1, 2018, from Wayne State University in order to switch specialties after his first year of residency. The program director at Wayne State provided UCI with a letter of good standing, stating that he had "performed satisfactorily in his academic and clinical duties and is on par with the rest of the residents in his class."

6

Appellant's first year evaluations from Wayne State included some negative comments about his clinical work: "'From a clinical standpoint there needs to be a significant improvement . . . ,'" "'the clinical aptitude is severely behind his peers,'" and "'overall he needs to really work on clinical acumen, awareness, preparedness, communication, physical exam skills . . . .'" While some commenters noted his academic knowledge, others stated that Appellant "'[n]eeds to work on adjusting to a team setting with understanding of hierarchy and when to ask for supervision. Very bright academically but needs to work on patient care skills as well as interpersonal skills with other staff and colleagues.'" Other comments included that he "'needs to work on his interpersonal skills some. He often jokes inappropriately, likely []as a defense mechanism after being criticized. He needs to take more ownership of the service, and become a more independent operator,'" and "'Needs to continue to work on ability to communicate and relay information to patients in appropriate ways. Has to remember that not every matter is a joking one.'"

During Appellant's first few months as a second year resident at UCI, he received positive evaluations from faculty and staff. Outside of the formal evaluation process, some raised concerns about his engagement and his behavior and professionalism.

As of December 1, 2018, Dr. Allen Chen assumed the role of program director. That same month, ACGME performed a site visit. According to Appellant, this visit was performed, in part, to address "concerns" raised by residents, but the portions of the records he cites in support of this contention do not support it. According to UCI, which does cite to supporting evidence in the record, the visit went "extremely favorably for all involved."

7

Appellant contends that feedback he allegedly provided to ACGME during this visit led to retaliation, but according to UCI, and the record,[3] the Program's faculty had no knowledge of any negative feedback to ACGME at or around the time of the visit. "None of the faculty including Dr. Chen were made aware of anything that the residents told the site visitor, nor was any attempt made to determine who said what or why."

In January 2019, the CCC rated Appellant as deficient in professionalism. He was assessed as follows: "Some unprofessional behavior and working interprofessional teams. [*sic*] He jokes around too much and it's difficult to know if he is serious or not. He's used racial slurs around the residents and it makes them uncomfortable. Jokes too much about past resident[]. He also has hygiene issues: white coat dirty, dining etiquette, manners, appearance. . . . [T]he Chief Resident had a conversation with Akshay[4] about his behavior and hygiene, which is documented." The CCC noted the next steps, if Appellant did not remedy his behavior, was a meeting with Chen and a letter of concern.

Around the same time, the Program's chief resident met with Appellant and noted he told Appellant "that there had been several concerns from members in the department about his behavior and professionalism. . . . I recounted several inappropriate jokes that he had made while I was at UCI previously, particularly ones about the drug use of a former resident and another joke that was racial in nature. I recommended to him to maintain a

_____

[3] The feedback Appellant purportedly gave ACGME, by his own description of it, was hardly damning. He said he told ACGME about "the lack of residents' inclusion in treatment planning."

[4] Appellant is sometimes referred to in the record as Akshay.

8

professional attitude at all times and refrain from jokes in both public and private work areas."

In February, the residency coordinator sent Appellant an e-mail about an incident during an early morning lecture. She stated that Appellant should "watch your tone and attitude. You came off very rude and I don't appreciate it." She also documented in an e-mail to another doctor in the Program that "I have several staff members who state that Akshay seemed 'rude' or 'abrupt' when speaking to them. Akshay asked our simulation therapist to find him when a breast patient was about to be simulated, but several times they were unable to get him (for multiple reasons). When Akshay spoke with the therapists next, they found him to be disrespectful. It created some conflict and tension. There were several general comments that he did not seem to 'understand general social conventions,' and they found his demeanor to be rude."

Dr. Jeffrey Kuo, who worked with Appellant for two weeks on one rotation, gave him a generally positive review in March 2019.

Other staff felt Appellant's performance continued to be problematic during the spring of 2019. One staff member at the site where Appellant was working, Long Beach Memorial Medical Center (Long Beach), noted Appellant had used a tone of voice with a superior that "stunned the room." Others involved in the program felt that Appellant was attempting to intimidate them: "He confronted me the other day because I was looking into his issues at Long Beach memorial (he may have snapped at a therapist at LBM). And I did not feel safe as he was trying to intimidate me into giving him answers that I did not have. It was mostly his body language, his tone, and his line of questioning (he kept asking me the same thing over and over).

9

I can document this as well. At this point I don't feel comfortable around him."

The residency coordinator reported that upon finding out of the issues with his performance at Long Beach, he "cornered me at my cubicle . . . displayed aggressive body language: chest puff, nostrils flaring, wide intense stare . . . . He kept asking me 'what's going on, what's the issue' . . . I told him that we received some concerning reports and we are just looking into what happened. I also told him multiple times that he really needs to speak to Dr. Chen and not me about this . . . . [¶] I felt very uncomfortable with the whole situation. Primarily because of his body language and that he wouldn't listen. . . . I felt as if he was trying to intimidate me to find answers that I did not have."

The Program did not provide formal written reviews during this period (due to the transition between program directors, according to UCI), but Chen, the new program director, had one-on-one meetings with each resident to discuss their performance and review goals and objectives with them.

*D. June 2019 Letter of Concern*

In May 2019, the CCC recommended to Chen that the Program issue a letter of concern to Appellant due to insufficient performance in three core competencies: professionalism, interpersonal/communication skills, and practice-based learning and improvement. The CCC noted that while Appellant was "very knowledgeable" and "smart and has a solid knowledgebase" he was also "resistant to critique and feedback," "[c]onsistently makes inappropriate comments, doesn't think before he says something," "[d]isruptive in lectures, and speaks out of turn." There had also been "[u]nprofessional interactions with staff/faculty at UCI and Long Beach

10

. . ." and an incident with a colleague where he told the colleague he would "lose his visa, and will then be deported because he'd be an illegal alien."

On June 6, Chen and the residency coordinator gave the letter of concern to Appellant. It was three pages long and set forth the areas of concern and steps to remediate them, including regular meetings with Chen and obtaining verbal feedback from his direct supervisor every two weeks. The letter also explained that the CCC's evaluation for 2018-2019 reflected that Appellant "did not perform at the level expected given [his] point in training, nor at the level of [his] peers, in a number of core competencies as defined by the [ACGME]."

Chen and the residency coordinator met with Appellant to discuss the letter. The letter had an acknowledgement which Appellant refused to sign, crossing out most of the language and acknowledging only that he had been given a copy of the letter. Shortly thereafter, Appellant wrote to Chen, minimizing or rejecting the concerns stated, and claiming that negative comments were "driven by personal bias."

*E. Appellant's Performance After the Letter of Concer*n

From May 2019 to January 2020, the record reflects the Program made a substantial effort to assist Appellant in remediating his deficiencies. Chen, Dr. Linda Chan, the Site Director at Long Beach, and other faculty met with Appellant at least 22 times. Appellant continued to deny the basis for the letter of concern and was blunt and hostile with faculty when they attempted to work with him on issues such as professionalism. At the end of a meeting with Appellant in mid-July, Chen told Appellant "that he was making me feel uncomfortable and that his body language was coming off as threatening and hostile to me . . . . I told him that part of being empathetic is

understanding how others feel around him, to which he sneered and stated that he would need to 'ruminate' later."

Appellant's year end evaluation in July 2019 rated him as below level in "Systems Based Practice," "Practice Based Learning & Improvement," "Professionalism," and "Interpersonal & Communication Skills."

In mid-August, the chief resident sent an e-mail to the program director about an incident in a classroom where Appellant had come up to him and wished him "'good luck.'" When the chief resident asked "'good luck with what?'" Appellant responded: "'You'll see.'" The chief resident stated that Appellant's response made him "extremely uncomfortable, anxious, and I believe it was a thinly veiled threat or an attempt to get into my head. To be honest I do not feel comfortable being near him . . . . In this era of workplace violence and mass shootings, this encounter made me question my safety and continues to creep me out."

In August, Chen noted that he had spoken to Chan at Long Beach. Appellant's end of rotation evaluations had resulted in some "high marks" from several doctors he worked with in regard to his clinical skill. Others, however, had noted that he was "rude," "dismissive," "arrogant," and had behaved "'in an aggressive' and unprofessional manner."

Chan was also "'taken aback' at how persistent [Appellant] was in trying to get her to change her evaluations. He also refused to accept responsibility for his deficiencies and instead blamed everything on the site/rotation (see below). In fact, he even told her the reason UCI is pulling away from [Long Beach] is because of the 'toxic work environment.' He claimed that it was only at [Long Beach] where he has had any interpersonal problems. He clearly has no insight into his behavior, and it's frightening."

12

In late August, Appellant sent a letter to ACGME's Office of Complaints stating that UCI did not conduct semi-annual and year-end performance evaluations for second year residents. In October, ACGME informed UCI of the complaint, which was the first time UCI learned of it.

UCI responded to ACGME's letter, acknowledging, as noted above, that in winter 2018-2019 "as the program was transitioning between program directors, the UCI residents were not provided with formal written semi-annual reviews. However, Dr. Chen did have face-to-face one-on-one meetings with each resident in March-April of 2019 to review goals and objectives, remind them of existing policies, discuss their academic and clinical performance, as well as to establish individualized learning plans." Further, the Program was now fully compliant with ACGME's requirements, with the CCC meeting at least every six months for resident evaluations.

In early October 2019, the CCC met to discuss Appellant's performance. All CCC members expressed concerns regarding his "lack of insight into why he was issued the letter of concern, his continued inability to express any remorse and/or accept responsibility for his conduct, and his refusal to engage in any process to carve a way forward. Since being issued the letter of concern, comments from evaluations continue to point to unprofessional behavior. Disappointingly, he continues to 'stonewall' the process of remediation."

The majority of members recommended probation, with several recommending immediate termination "given the seriousness of the observed behavior, downright ugly statements that were made by [Appellant], and his complete disregard for the remediation process." Further, "a number of CCC members did raise concerns regarding their personal safety and stated they have felt physically threatened by [Plaintiff's] body language, strange

13

interactions, and aggressiveness in the past. One member even stated that she feels Akshay is capable of 'shooting up' the workplace given his past conduct and asked whether something could be done as a preventive measure." Chen did not accept the recommendation for immediate probation, and faculty continued to meet with and attempt to work with Appellant.

In October 2019, Appellant, rather than working to remedy the issues identified, was still denying the basis for the letter of concern. At a meeting with the CCC, he referred the committee to his June response letter to Chen, asking "what was the issue" in terms of professionalism. He did not seem to understand that a resident could receive positive feedback from some faculty on some factors and still receive a letter of concern. He was quoted as saying "everyone receives mixed comments." Appellant was reminded that the purpose of the meeting was to track his progress, and he said he wanted to fulfill expectations as a resident, but he "has continued questions with the content of the letter of concern."

With respect to his current rotation, which was at the Long Beach VA, Chen received feedback from Appellant's supervisor (a Dr. Inouye) that he works hard and shows up on time. "However, there were times when Dr. Inouye had pulled Dr. Ramakrishnan aside to give some advice. Dr. Inouye said that Dr. Ramakrishnan needed to work on developing higher levels of emotional intelligence with interactions. He sometimes spoke out of turn during tumor board. Dr. Chen said Dr. Inouye even mentioned an incident where Dr. Ramakrishnan questioned a pathologist in a somewhat aggressive manner. After this incident, Dr. Inouye had to pull Dr. Ramakrishnan aside and tell him that he has to be more respectful when talking to others. Dr. Inouye has asked Dr. Ramakrishnan to work on these little things."

14

In November 2019, an assistant professor stated he had noticed "erratic behavior" by Appellant during his lectures, where he had "displayed a noticeable disinterest towards the importance of research in the field of Oncology." He was concerned by Appellant's "overall lack of enthusiasm for the didactic training."

On January 6, 2020, a letter to Chen from a second assistant professor reported Appellant's "inappropriate behavior." (Boldface omitted.) The letter noted "[a] noticeable lack of motivation in the class," "unnecessary disruptions," and "[n]ot paying attention in the class, and being engaged continuously with his cell phone." In both of these cases, the complaining faculty were based at UCI, and had no knowledge about the letter of concern or other issues with Appellant.

*F. Probation*

On January 27, 2020, the CCC met to discuss Appellant. Earlier that month, the CCC had recommended Appellant's immediate dismissal. Chen stated he had instead given Appellant a letter of probation on January 22, which was signed by himself and Dr. Jeremy Harris, the associate program director. The letter identified practice based learning and improvement, interpersonal and communication skills, and professionalism as continuing areas of concern. The letter expressed that the CCC was "highly concerned that clinically and professionally, you are not performing at the expected level" of a third year resident. The letter warned that Appellant "must demonstrate significant improvements" in the identified areas. "This includes you proactively creating a collegial work environment among co-workers; no further instances of aggression causing feelings of discomfort; no further instances of culturally insensitive remarks and behaviors; and no further instances of unprofessionalism. Failure to comply

15

will result in disciplinary action up to and including termination." The letter set forth requirements for Appellant to complete, including regular meetings with his direct supervisor and other faculty and staff. He was also required to meet specific benchmarks on evaluations and milestones. Again, he refused to sign the letter's acknowledgment. Instead, he handwrote: "The contents of this letter have been read to me by Dr. Jeremy Harris on the date of my signature. I have been given a copy of this letter. [¶] However, I disagree with the narrative in the letter and request an independent third party investigation on the issues presented."

After the probation letter, faculty continued to meet with Appellant to try to assist him. Appellant did not respond well, and continued to react defensively. For example, he would focus on the date a specific complaint letter was written rather than attempting to understand the necessary steps to remediate his performance. He refused to engage in self-reflection during meetings, instead stating that he was "still thinking" or "processing" the feedback he had received. During one meeting, he stated that a question about his communication with a certain department was "a trap." At one point he refused to discuss certain issues at all, stating they were under "active investigation," as he had started a grievance about his

discipline with UCI.[5] Faculty members were concerned about the lack of active engagement, which appeared to grow more problematic in later meetings.

In March 2020, a third professor stated that he had given Appellant a second session of feedback that week, informing Appellant that the session "was conducted with the intention to help improve his understanding of . . . professionalism, and aptitude as a radiation oncology resident." After the session, Appellant sent the professor a letter with a "summary of our feedback session," which surprised the professor. The professor characterized the document as "absolv[ing] himself of any suboptimal practice or wrongdoing . . . . He then goes on to manipulate patient data out of context to place false accusations towards the care team which make team members uncomfortable." After stating he would provide a detailed response the following week, the professor closed by stating: "For now, I feel his goal on our service is far from trying to improve and learn as a medical resident. Rather, he presents himself daily to seek out a fallacy and document it as a violation of 'patient safety' while ignoring the facts and clinical learning afforded to him."

---

[5] In January 2020, Appellant filed a grievance with the Office of Graduate Medical Education, claiming the Program "'engag[ed] in retaliatory behavior as a result of honest feedback that [Appellant] gave the program.'" In April 2020, the Office of Graduate Medical Education completed an investigation and concluded "the Program committed three technical failures," but that "[t]hese deficits do not appear substantial enough to invalidate the conclusions of the CCC" regarding Appellant's performance, the issuance of the letter of concern, or his evaluations. Further, the investigation found no improper motive, retaliation, or substantiation of Appellant's claims of fabrication or falsification of documents relating to him or his performance.

In a later summary of Appellant's performance, the same professor noted numerous clinical problems, including falsifying treatment information and that Appellant had incorrectly "staged" a patient during a consult. The same evaluation noted Appellant was "'combative over the phone with attending.'" At times he did not answer the phone when called.

In his evaluation for the period December 2019–April 2020, some comments were positive. Others were not: "'Does not accept responsibility for his actions, and is completely un-amenable to receive how others perceive his actions, attitude, and demeanor. I have had several meetings with him, where clear and concrete instances of how his peers experience him, some of which were not positive [were discussed]. He made zero attempt to understand why, asked zero questions about how we can improve, and was resistant to the entire remediation process.'" Another: "'Lacking in leadership and does not seem to be able to accept responsibility for his own actions.'" One comment stated he "'does not receive constructive feedback well.'" Professionalism and communications were a consistent theme throughout this evaluation.

On April 30, 2020, Dr. Jeffrey Kuo, the new program director, and Harris issued a notice of intent to dismiss Appellant (the dismissal notice). The dismissal notice again explained, in detail, Appellant's deficiencies, the prior disciplinary measures taken to attempt to give Appellant the opportunity to remedy them, and the faculty and staff's efforts to assist in doing so. Appellant again refused to sign the acknowledgement and handwrote onto the notice that he had received it, among other things.

18

*G. Internal Review*

       1.  First Level of Review

Appellant filed an appeal from the Dismissal Letter. Charles Limoli, Ph.D., professor and vice-chair of research and academic affairs in the Department of Radiation Oncology, was the Level One reviewer. Limoli "reviewed this matter applying the standard of whether the decision was supported by the evidence submitted by the department, or whether the evidence and arguments submitted by the resident made the department's decision unreasonable." Limoli did "not find sufficient grounds to overturn the Notice of Intent to Dismiss, and thus uphold the Department's decision to dismiss [Appellant] from the residency program. In brief, the specifics detailed in the Notice of Intent to Dismiss were simply not addressed, or addressed by inference only in the resident's 20-page response. By email dated May19th, I advised [Appellant] that my initial review of the appeal he submitted did not address what I felt were the grounds set forth in the Notice of Intent. [Appellant] did not elect to submit additional, germane material."

Limoli's conclusions were as follows:

- "This is an individual training to care for people having a serious, often life-threatening disease. The negative trends identified point to a lack of compassion and care for the overall system in how the team must operate to care for these individuals. Precisely how the resident envisions himself integrating into such a system was a concern, and steps taken to resolve areas of defined deficiency were not met.

- "There were recurrent trends that clearly identified difficulties properly evaluating professional criticism,

19

where defensive, dismissive and intimidating behavior (whether verbal or by body language) are potentially dangerous in a clinical setting. In such a setting a calm, smooth, efficient and professional demeanor is required when dealing with critically ill patient populations.

- "In the workplace environment, it was clear that most parties (at nearly every level), had difficulty working with and interacting with the resident.

- "I was left with the clear impression that the resident lacked the academic and personal skills necessary to become a good, effective practitioner. The evidence leads to that inevitable conclusion. The resident failed to seize the opportunities to remediate, accept constructive criticism, and exhibit a good-faith attitude toward the remediation process. The evidence of these failures supports the conclusion that remaining in the residency program would only lead to additional failures and the department was reasonable in coming to that conclusion."

Limoli noted Appellant's appeal included "[s]tatements regarding deception, retaliation, abuse of authority and defamation. . . ." He found these statements "were, in large part, unsubstantiated and deemed non sequiturs. The preponderance of claims and allegations did not address the reasons for dismissal, and were a collection of complaints that should have been brought and reviewed through different channels."

Limoli also noted that Appellant had made some very strong claims against Chen, but that Chen did not issue the Dismissal Notice or participate at the CCC meeting where the dismissal was discussed, and

20

deemed Appellant's relationship with Chen to be of little import. Appellant had failed "to submit any credible evidence to support" his claims of retaliation, hostile work environment, or lack of due process.

2. Level Two Review

Appellant sought Level Two review. The associate dean of graduate medical education convened a three-person committee for this purpose. The chair was Dr. Kyle Ahn. The committee had a prehearing conference with Appellant and his counsel, where "it was agreed by the parties that the issue before the Committee was whether the Level One review affirming the decision to dismiss [Appellant] was reasonable and not arbitrary and capricious."

The committee held approximately 20 hours of hearings. "[T]he parties had the opportunity to present witnesses, conduct direct and cross-examination of witnesses, seek to introduce documentary evidence not previously submitted, and present argument."

Ultimately, "the Committee was fully persuaded by the arguments and evidentiary support provided by the administration's briefs in support of the decision, and the related process, to dismiss [Appellant]. In contrast, the Committee did not find [Appellant]'s brief persuasive in any regard, as it contained little if any evidentiary support for his arguments, which were almost exclusively based upon speculation and conjecture. Further, the performance deficiencies of [Appellant] upon which his dismissal was based, and which [Appellant] sought to demonstrate were unfounded on appeal, were on full display by [Appellant] during the hearing, lending great weight and credibility to the administration's dismissal determination and undermining the credibility of [Appellant]'s arguments."

The committee determined "the evidence amply demonstrated that the School of Medicine's decisions concerning continuing [Appellant] in the training program were carefully considered at each step, supported by multiple levels of review, numerous evaluators, and thorough assessments. Our own review indicates that there is a very high level of evidence, well beyond a preponderance, supporting the dismissal decision." The committee found the letter of concern, letter of probation, and dismissal notice were well supported. Further, the committee determined that Appellant had not demonstrated, by a preponderance of the evidence, that the Level One decision was arbitrary and capricious, or that UCI had not provided a good faith effort at assessment or remediation. Appellant had also failed to establish that any of the individuals he accused lacked credibility.

The committee also found that Appellant's conduct during the hearing supported the credibility of the negative performance evaluations and undermined his arguments. Among the behavior the committee observed was defensiveness, inability to accept constructive feedback, questioning the judgments of the chair instead of accepting them and moving on, the inability to acknowledge lapses in judgment and blaming others for them, attempting to manipulate the statements of others in order to blame others for his own deficiencies, and lack of self-awareness and accountability. In sum, the committee found "there is an abundance of evidence demonstrating that the decision to dismiss [Appellant] was well considered and reasonable, and not arbitrary and capricious." The committee recommended that the dean, Stamos, uphold the decision to dismiss Appellant.

3. Level Three Review

Appellant challenged the committee's recommendation in a letter to Stamos. After reviewing materials presented during the first two levels of

review, Stamos requested additional briefs on the issue of whether Appellant should have been permitted to introduce evidence to the level two review committee regarding his claims that negative evaluations of Appellant were false and in retaliation for the ACGME complaint. After receiving the briefs, Stamos remanded the matter to the committee and directed them to hold a supplemental hearing on two issues: "(1) whether the negative evaluations of [Appellant] that supported the decision of the Department to dismiss him were made solely for the purpose of retaliating against him for filing a complaint with the ACGME, and (2) was the evidence provided of poor performance noted in the Notice of Intent to Dismiss false or otherwise unreliable."

4. Supplemental Hearing

After the supplemental hearing, the committee issued an addendum to its report, finding that Appellant had failed to meet his burden and there was insufficient evidence to support the claim of retaliation or unreliability of the evidence of Appellant's performance. The committee again recommended dismissal.

5. Dean's Final Level Three Review

Appellant again challenged the committee's recommendation. After asking for and receiving briefing on the review itself, Stamos accepted the committee's recommendation and affirmed Appellant's dismissal from the Program on July 27, 2022. Stamos noted that the letters of concern and probation gave Appellant notice of his deficiencies, he had been afforded three days of hearings on the matter, and that Appellant had failed to meet his burden on his assertions.

*H. Whistleblower Complaint*

Prior to Appellant's dismissal, and around the same time he submitted a complaint to the Office of Graduate Medical Education (see fn. 5, *infra*) in January 2020, Appellant filed a whistleblower complaint with UCI, again alleging he had been subject to retaliation for submitting complaints to ACGME. In April 2020, the Whistleblower Office issued a report concluding, "after a full review of the record" that "the actions were not retaliatory."

*I. Civil Action*

Appellant subsequently filed a civil lawsuit alleging retaliation. *Ramakrishnan v. Chen, et. al*, (Super.Ct. Orange County, No. 30-2023-01338944). This case is apparently pending.

*J. The Instant Writ Proceeding*

In August 2022, Appellant filed a petition seeking a writ of mandate pursuant to sections 1085 and 1094.5. His section 1085 claim alleged UCI's policies "do not offer residents any opportunity to be heard when serious accusations are made, or when adverse or disciplinary action (e.g., Letter of Concern, Probation, or adverse CCC evaluations) is undertaken thus depriving Petitioner and other residents of their dignity interests and Due Process." He alleged UCI's actions were invalid because UCI had "a ministerial duty to follow the UCI Policy, and Due Process Clause of the California Constitution, Cal. Const., art. I, § 7, and Petitioner has clear and beneficial rights to his employment, his education, Due Process rights, and equitable treatment under the University's Policies. [UCIs'] actions are arbitrary, capricious, and lacking in evidentiary support."

His claim under section 1094.5 alleged UCI failed to provide him with his administrative due process "rights or to conduct its procedures in the manner required by its own policies and procedures. The decision is not

24

supported by reasoned findings, and the conclusory findings are not supported by facts or evidence."

Appellant's prayer for relief requested an administrative writ vacating the dean's dismissal decision, the rescission and expungement of his dismissal, lost income, various other costs, including legal fees and the costs of additional training, and the Program's "earnest" assistance in his transfer to another program.

After additional briefing the court issued a tentative ruling, then denied the writ petition. The court rejected Appellant's argument that UCI did not follow its own policies in its dealings with him. With respect to the contention that UCI was required, under its policies, to provide a formal, written mid-year review, the court found the language in the policy permissive ("should provide. . . a written evaluation") rather than mandatory. Moreover, during the period Appellant did not receive a formal written semiannual review, he nonetheless participated in a one-on-one meeting with Chen to discuss academic performance and other matters. After the letter of concern was issued, Appellant had regular meetings with faculty and staff. Additionally, UCI "provided ample opportunity"—the letter of concern, probation, dismissal notice, and three levels of appeal—"to be apprised of the charges and afforded him a meaningful opportunity to respond."

As to Appellant's claim that UCI initially provided his academic file with redactions, the court found he "has not specified exactly what information he believes would have changed the outcome of the proceeding or explained how the information would have done so," and accordingly, "the Court cannot find that he was deprived of a fair hearing as a result of the redactions."

25

The court also rejected Appellant's contention that he was deprived due process because he was not permitted to argue his case to the CCC. "[P]ursuant to the Policy, the ultimate decision maker was not the CCC, but Dean Stamos" and "[t]he Policy provided [Appellant] with ample opportunity to address the charges, including through written responses, a hearing, and, significantly, through written communications directly to the Dean."

The court next addressed Appellant's claim of a conflict of interest, specifically his assertion that because he made a complaint to ACGME, UCI had an incentive to remove him from the Program in order to protect the Program's accreditation and UCI's financial interests. The court noted that these claims appeared to be the same ones Appellant was making in his civil lawsuit, and he "conceded that he is not pursuing those claims in this writ proceeding." Further, even if the court considered this argument on the merits, it concluded UCI's decision was supported by substantial evidence and not an abuse of discretion. The court found "the decision is based on substantial evidence in the form of statements and testimony from numerous individuals who worked with and/or observed [Appellant]," not all of whom knew about his complaint to ACGME.

Appellant filed the instant appeal after judgment against him was entered.

## DISCUSSION

### I.

#### SCOPE OF APPEAL AND STANDARD OF REVIEW

California law provides "for two types of mandate review: ordinary mandate and administrative mandate. [Citation.] The nature of the administrative action or decision at issue determines which type of review

26

applies. [Citation.] In general, administrative mandate under . . . section 1094.5 is used to review the validity of quasi-judicial decisions resulting from a proceeding in which (1) a hearing was required to be given, (2) evidence was required to be taken, and (3) discretion in the determination of facts was vested in the agency. [Citation.] In administrative mandate cases, abuse of discretion is established if the agency has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by substantial evidence in light of the whole record." (*Martis Camp Community Assn. v. County of Placer* (2020) 53 Cal.App.5th 569, 593 (*Martis*).)

Our review "'extends to questions about . . . whether there was a fair trial, and "whether there was any prejudicial abuse of discretion."'" (*O'Brien v. Regents of University of California* (2023) 92 Cal.App.5th 1099, 1115.) The University of California's "quasi-judicial agency decisions are subject under section 1094.5, subdivision (c), to substantial evidence review, in which 'abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record.'" (*Do v. Regents of University of California* (2013) 216 Cal.App.4th 1474, 1484.)

"Ordinary mandate under . . . section 1085 is used to review ministerial acts, quasi-legislative acts, and quasi-judicial decisions which do not meet the requirements for review under Code of Civil Procedure section 1094.5. [Citations.] In such cases, the appropriate standard is whether the agency's action was arbitrary, capricious, entirely lacking in evidentiary support, or failed to follow the procedure required by law." (*Martis, supra,* 53 Cal.App.5th at pp. 593–594.)

27

Additionally, "the ultimate determination of procedural fairness amounts to a question of law." (*Nasha v. City of Los Angeles* (2004) 125 Cal.App.4th 470, 482 (*Nasha*); *Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1073.) We therefore review it independently. Any question of statutory interpretation or other questions of law are also reviewed de novo. (*Department of Corrections & Rehabilitation v. State Personnel Bd.* (2015) 238 Cal.App.4th 710, 716–717.)

"On appeal in mandate actions, the trial court and appellate court perform the same function. [Citations.] We review the agency's action, not the trial court's decision." (*Martis, supra,* 53 Cal.App.5th at p. 593.)

II.

UCI SATISFIED DUE PROCESS BY FOLLOWING ITS OWN PROCEDURES

Appellant points to three purported failures by UCI to follow its own procedures. "1) Failure to provide a 2018-2019 mid-year evaluation and remediation plan; 2) failure to provide an appeal to CCC for the 2018-2019 (adverse) annual evaluation; 3) failure to provide Appellant with all material facts prior to the Level-1 review." The burden is on Appellant to demonstrate these failures deprived him of due process.

The university must follow its own policies. (*Berman v. Regents of University of California* (2014) 229 Cal.App.4th 1265, 1271.) Further, "a university satisfies the demands of procedural due process if it informs the student of its dissatisfaction with the student's academic performance, it informs the student of the consequences of deficient performance, and a decision regarding the student's academic progress is careful and deliberate." (*Lachtman v. Regents of University of California* (2007) 158 Cal.App.4th 187, 201.)

28

*A. Evaluations*

With respect to Appellant's first claim, the Policy states that "[t]he Program Director should provide each [resident] with a written evaluation at least twice per year." He claims this prevented a fair process and deprived him of due process.

We disagree. The policy language is plain enough ("should" rather than "shall" or "must") that this is not a mandatory requirement. Appellant's arguments about ACGME's evaluation requirements are not pertinent to an inquiry about the Program's internal policies.

Even if the language of the Policy was mandatory, the Policy also states that "deviation from these procedures that does not result in material prejudice to the resident . . . will not be grounds for invalidating any action taken pursuant to these procedures." (Capitalization omitted.) Assuming the Program should have provided a formal written review, Appellant instead had an in-person, one-on-one meeting where he received feedback from the program director.

Appellant claims there was no substantial evidence this meeting took place. We disagree. UCI represented such meetings occurred to ACGME in its December 2019 response to Appellant's complaint. Moreover, the Associate Dean of Graduate Medical Education stated as much in a response to Appellant. Appellant makes much of a discrepancy in the evidence as to the timeframe when these meetings occurred—January as opposed to March/April 2019, but this does not call into question *if* the meetings occurred. Appellant provides no citation to the record calling this into question. These meetings were a reasonable substitute for a written performance review. There is no evidence that the difference between what Appellant claims he was entitled to and what he received was prejudicial.

Accordingly, the lack of a written evaluation, when verbal feedback was offered, was not prejudicial.

*B. Appeals to the CCC*

Appellant next claims he was denied due process because he was not allowed to appeal to the CCC at multiple points—his January 2019 assessment, the letter of concern, his 2018–2019 annual evaluation, and the letter of probation. He claims he should have been able "to present his case to the CCC." He also claims that UCI's three-stage review from dismissal "does not comport with due process." As an appeal from the Policy itself, the appropriate standard under section 1085 is whether the Policy is arbitrary or capricious, or fails to follow a legally required procedure. (*Martis, supra,* 53 Cal.App.5th at pp. 593–594.)

As UCI points out, residents do have the right to appeal to the CCC in writing if the resident receives an overall marginal or unsatisfactory annual evaluation. Such a request triggers the appointment of a three-person committee to review the matter and reach a decision. This provision did not apply to Appellant because he did not receive an overall marginal or unsatisfactory evaluation, rather, he was found to be deficient in three specific areas, as discussed above.

Appellant's argument also assumes that the CCC makes decisions, when the CCC's role is, in fact, advisory. It is the program director who makes the decisions. For example, as we noted above, in October 2019, the CCC recommended that Chen place Appellant on probation, with several recommending immediate termination. But Chen decided to continue trying to remediate Appellant's performance. It is apparent that Chen, not the CCC, was making the ultimate decisions.

The CCC's advisory role is consistent with ACGME's guidance, which states, "The program director is the final decision maker." ACGME also cautions that "[p]rograms should be aware that allowing residents/fellows to appeal performance evaluations (rotational evaluations, semi-annual evaluations, etc.) can send a message to the residents/fellows that faculty or program director feedback is negotiable. It can also suggest to faculty members and program directors that their feedback, usually critical feedback, can be subject to scrutiny and overturned if a resident/fellow complains."

Appellant has not established the Policy regarding appeals from evaluations or CCC recommendations is arbitrary and capricious. "Under the arbitrary and capricious standard, the question is whether the agency's action has a reasonable basis in law and a substantial basis in fact." (*Martis, supra*, 53 Cal.App.5th at p. 595.) The Policy allows residents to appeal adverse *actions*, such as dismissal. As ACGME's guidance states, sending the message that adverse evaluations are negotiable if the resident complains undermines the entire system, which is based on the willingness of all participants to provide and receive feedback in good faith.

Further, there is no demonstration here that Appellant's lack of an opportunity to appeal CCC recommendations or his evaluations was prejudicial. He was informed of his deficiencies and given every opportunity to amend them prior to dismissal. From the record before us, it appears he was uncooperative, disdainful, and in denial throughout. Appellant has not demonstrated that further opportunities to appear before the CCC would have helped him.

31

*C. Receipt of Materials After Dismissal*

The Policy states that a dismissal "notice will include a statement of the reason(s) for the intended dismissal, a copy of the materials upon which the intended dismissal is based, and a statement that the [resident] has a right to respond in writing to the Chair within ten (10) calendar days of receipt of the notice." The dismissal notice states the materials that formed the basis of the decision were Appellant's "entire academic file."

Appellant complains that supporting materials were not initially provided, and when they were, they were "heavily redacted." According to Appellant's own handwritten comment, he received the dismissal notice on May 10, 2020, and promptly received 535 pages from his academic file.

One issue Appellant identifies was the redacted nature of the chief resident's August 2019 complaint, mentioned above, which stated an interaction with Appellant made him fearful of workplace violence. But workplace violence was not the reason for dismissal, which Stamos made clear when he upheld Appellant's dismissal. "This [was] a case of academic disqualification, not discipline." (Capitalization & underlining omitted.)

Appellant spends much time arguing prejudice because he did not receive notes from CCC meetings until the dismissal review process had begun. But meeting notes were not the reason for his dismissal any more than a single complaint from the chief resident was the reason. The reasons for his dismissal were clearly laid out for him, in writing, at least twice while he had the chance to remediate them—in the letter of concern and the probation letter. Both made it clear that Appellant was deficient in multiple core competencies. Faculty members made repeated efforts to help him to remediate these deficiencies. He was dismissed because he failed to do so. Appellant has not established a due process violation.

32

*D. Overall Fairness*

Taking into account the entire record and exercising independent review, we conclude that Appellant was accorded due process, and UCI did not abuse its discretion or take other steps that rendered the process fundamentally unfair. At every relevant stage, Appellant was provided with notice of his deficiencies and given multiple opportunities to amend them. This is the very essence of due process in this context. (*Lachtman v. Regents of University of California, supra,* 158 Cal.App.4th at p. 201.) Prior to his dismissal, he received a letter of concern and probation letter extensively reviewing the issues surrounding his performance and establishing concrete steps to amend them. Following each letter, faculty and staff made concerted efforts, documented in the record, to work with Appellant to overcome his obstacles and improve his performance. Rather than taking the feedback seriously, Appellant resisted and rejected the feedback, sometimes refusing to engage at all.

After he was dismissed, Appellant had three levels of review. Each of these reviews was conducted fairly and in accordance with the Policy. In short, the process was fair, and Appellant was afforded ample notice and opportunity to be heard, of which he availed himself fully. We find no arbitrary and capricious action by UCI, and no fundamental unfairness in the process.

Finally, Appellant does not contest UCI's substantive findings regarding his performance, but to the extent they are relevant, those findings were supported by substantial evidence in the record. Accordingly, there was no abuse of discretion. (*Do v. Regents of University of California, supra*, 216 Cal.App.4th at p. 1484.)

## III.

### APPELLANT HAS FAILED TO ESTABLISH BIAS

Appellant next argues that Chen, Stamos, and Deena McRae (the Associate Dean of Graduate Medical Education) all had "a financial conflict of interest" that biased them during the dismissal process. He explains that because of his complaint to ACGME, and the "loss of ACGME accreditation would lead to a loss of the residency program," a financial incentive to discredit Appellant to "protect their residency program" was present.

Procedural due process in an administrative hearing requires a reasonably impartial, noninvolved decision maker; however, the standard of impartiality "'is less exacting than that required in . . . judicial proceeding[s].'" (*Nasha, supra,* (2004) 125 Cal.App.4th at p. 483.) In other words, the decision makers do not have to be completely separate from the institution in an administrative hearing. "Absent a financial interest, adjudicators are presumed impartial." (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 219.) It is presumed that "agency adjudicators are people of "'conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances."'" (*Id.* at pp. 221–222.) ""'[B]ias and prejudice are never implied and must be established by clear averments.'"" (*Nasha, supra*, 125 Cal.App.4th at p. 483.) "A party seeking to show bias or prejudice on the part of an administrative decision maker is required to prove the same 'with concrete facts.'" (*Ibid.*)

Appellant offers no concrete facts—only speculation. The material Appellant relies upon does not demonstrate financial bias, only the attempt to organize and document complaints and facts that had been conveyed to faculty and staff. None of it demonstrates an attempt to

"discredit" Appellant due to his ACGME complaint. Instead, what the record does show is extensive efforts by faculty and staff, as discussed above, to help Appellant remedy his deficiencies.  Further, the record does not reflect that dismissing Appellant provided any benefit to the Program.

Appellant has failed to demonstrate that bias had any impact on his dismissal.

## IV.

### THE TRIAL COURT'S STANDARD OF REVIEW

Appellant next contends the trial court applied the wrong standard of review. Even if this were true, which it is not, it would not impact the outcome of this appeal. As we stated above, our review is from "the agency's action, not the trial court's decision." (*Martis, supra,* 53 Cal.App.5th at p. 593.)

## DISPOSITION

The trial court's order is affirmed. Respondents are entitled to their costs on appeal.


MOORE, ACTING P. J.

WE CONCUR:


SANCHEZ, J.


SCOTT, J.

35